[Crim. No. 1867.   First Appellate District, Division Two.—March 10, 1936.]

THE PEOPLE, Respondent, v. JESSE SIMMONS, Appelr lant.

Melvin M. Belli and Frederick J. Schoeneman for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

STURTEVANT, J.—The defendant was convicted of child stealing as provided in section 278 of the Penal Code. He made a motion for a new trial but his motion was denied and he has appealed from the judgment of conviction and the order denying his motion.

For some time prior to September, 1934, the defendant had been living in Oakland. He was about thirty-three years of age, had been married, and was the father of two children. However, on June 4, 1934, his wife obtained an interlocutory decree of divorce. For some time Mrs. Ruth E. Kair had been living in an apartment house at 1219 Brush Street in the city of Oakland. The defendant first met the Kairs in October, 1933, when he rented an apartment in the building in which they resided. At that time he was known as Jesse Styles. When he came to the apartment he brought a woman to live with him but when Mrs. Kair learned that the woman was not his wife she directed him to move. He did so, but in March returned and again rented an apartment. He remained only one month and again Mrs. Kair directed him to vacate the apartment. She did not see him again until the month of August when she saw him holding her daughter's hand down in the front yard where they were half hidden behind a bush. Mrs. Kair approached him, slapped him and said: "You dirty black cur, don't touch your hand on this girl again or you will regret it the last day you live." The defendant left the premises but told a neighbor that Mrs. Kair had slapped him and that she would be sorry for it some day. Prior to September, 1934, the defendant and Lucille Kair, a minor, met at times and went out together at night, although never with the consent of Mrs. Kair. They talked of marriage and about going away but nothing was said to Lucille's mother. The defendant suggested to Lucille that they get married but also stated that he could not do so under the laws of California until the divorce decree became final. However, they discussed the possibility of going outside of the state and claimed that by so doing they could legally marry. On September 28, 1934, Mrs. Kair left Oakland for a two-day visit and left her children in the care of Mrs. George, a tenant in the same building. For some time prior to that date Mrs. Kair had a savings account which stood in the joint names of herself and Lucille. The account had been so made that Lucille could withdraw money for

family necessities in the event her mother was ill, but none of the money in the account belonged to the daughter. When Mrs. Kair left home the pass book was left in the drawer of a dresser but she gave no consent that Lucille withdraw any of the money. The day after Mrs. Kair left Oakland Lucille visited the defendant at his hotel and there they planned to leave Oakland. Lucille went to the bank, drew out the entire account, $320, and turned it over to the defendant. They arranged that she should meet him that night at 10:30. The defendant took the money to an automobile dealer and bought a second-hand Buick for $170, plus the tax. At about that time he stated to a friend that he was buying it to take a trip, that he had a farm up in Washington or Oregon where he was going to take Lucille. He also stated that she was pregnant and that he was responsible. To the same party he stated that he could be located in the next few days by addressing him as Joe Lenhardt, General Delivery, San Diego, California. The friend was also told by the defendant not to disclose said fact to anyone. That night at the appointed hour Lucille left her home with a suitcase containing all her clothes and met the defendant about a block away. At that time Lucille thought she was going to Nevada to get married. However, they drove down through Fresno to San Diego. Just before daybreak the next day they arrived at the home of defendant's sister, Mrs. White. Later on that date they crossed the line to get married at Tijuana, Mexico. Failing to find a justice of the peace they returned to San Diego. The next day they again went to Tijuana and were there married by a priest. Again they returned to Mrs. White's home where they remained for about a week living as man and wife. Three or four days after they left Oakland, Fred Langerman wrote to the defendant at San Diego informing him that the police were looking for him. After remaining a short time longer in San Diego the defendant gave Lucille money with which to purchase a ticket on the bus and she returned to Oakland. A short time thereafter the defendant also left, intending to hitch hike to Oakland. After Lucille had returned to her home the defendant both telephoned and wrote Mrs. Kair many times requesting her to withdraw the charges against him. At all times he withheld information as to where he was.

In presenting his appeal the defendant contends (1) there was no forcible enticing; (2) there was no fraudulent enticing; (3) there was no malicious enticing; and (4) there was no concealment *and* detention, neither was there concealment nor detention.

Section 278 of the Penal Code is as follows: "Definition and punishment of child-stealing. Every person who maliciously, forcibly, or fraudulently takes or entices away any minor child with intent to detain and conceal such child from its parent, guardian, or other person having the lawful charge of such child, is punishable by imprisonment in the state prison not exceeding twenty years." The offense so defined is against the parent and not against the child. (*People* v. *Gillispie,* 104 Cal. App. 765, 767 [286 Pac. 502].) The word "forcibly" as used in this and similar statutes does not necessarily imply the use of physical force. (1 C. J. 285.) The word "maliciously" as used in the statute does not, at least, have a narrower meaning than as defined in subdivision 4, section 7, of the Penal Code. The word "fraudulently" is very broad in its meaning. "No definite and invariable rule can be laid down as a general proposition defining fraud, as it includes all surprise, trick, cunning, dissembling, and unfair ways by which another is deceived." (*Wells* v. *Zenz,* 83 Cal. App. 137, 140 [256 Pac. 484].) ██ As the language of the statute is in the disjunctive it was sufficient if the proof showed that the defendant's act was either malicious, forcible or fraudulent. The prosecution was not bound to prove all three. ██ The statute does not include "concealment" nor "detention". It does contain as an element "with intent to detain and conceal". As proof of that element the courts will consider the acts and conduct of the parties, together with all the circumstances of the case both before and after the act complained of. (*People* v. *Black,* 147 Cal. 426, 431 [81 Pac. 1099], *People* v. *Taylor,* 88 Cal. App. 495, 500 [263 Pac. 560], and *People* v. *Annunzio,* 120 Cal. App. 89, 94 [7 Pac. (2d) 739].) "It cannot be gainsaid that proof of intercourse with the girl by the appellant while they were in Los Angeles tended directly to show the intent with which she was enticed from her parents." (*People* v. *Edenburg,* 88 Cal. App. 558, 568 [263 Pac. 857].) ██ When the proof is

measured by the foregoing rules, it is not insufficient in any respect.

The judgment and order appealed from are affirmed.

Nourse, P. J., and Spence, J., concurred.